May it please the Court, Arthur Catterall of the Justice Department on behalf of the Commissioner and I'd like to reserve five minutes of my time for rebuttal, if I may. The taxpayers in this case do not seriously dispute that a sale of the stock of a corporation holding nothing but cash, in essence an exchange of cash for cash, is an economically meaningless gesture. Nor do they suggest that Arizona courts, which apply substance over form principles in a variety of situations, are for some reason prohibited from doing so in fraudulent conveyance or fraudulent transfer cases. Rather, they maintain that the substance of their purported stock sale, effectively their receipt of all but $6 million of the corporation's cash at a time when it faced a $15 million tax liability, cannot be held against them under Arizona fraudulent transfer law unless their advisors should have known that the purported stock purchaser had no viable means of eliminating the tax liability. Now, finding no Arizona cases on point, the tax court adopted the taxpayers' position on the strength of its memorandum opinion in a case called Alterman Trust, in which the court finding no Florida cases on point relied on its memorandum opinion in a case called Starnes, in which the court finding no North Carolina cases on point relied on a Second Circuit case, HBE Leasing, with an entirely different fact pattern. HBE Leasing involves the situation where one party engages in a fair exchange with the debtor, and then the debtor transfers the property it received in that exchange to a second party for no consideration. Applying New York fraudulent conveyance law, the Second Circuit held that if the first party in that situation knew or should have known of the debtor's plan to retransfer the property to the second party for no consideration, then the routing of the property through the debtor may be collapsed, i.e., treated as a direct transfer from the first party to the second party. And this would have the effect of rendering the first party a recipient of the debtor's property for no consideration, thereby subjecting him to the constructive fraud provisions of the relevant fraudulent transfer statute. Sotomayor, let me back you up for a minute. I'm sorry? Let me back you up for a minute. Sure. I don't regard my tax experience as being among my more glorious moments on the bench. So when you said that the transfer of the stock was to an entity that the taxpayer knew could not pay or couldn't pay the tax liability, is that what you said? Well, they knew that the price that was paid for the stock did not take into account the tax liability. Exactly. In fact, the purchase price was determined as a specified percentage of the tax liability. Did they have to know that the buyer had borrowed the money and wouldn't be able to pay the tax liability? I don't know that they would have to know that. In this case, they were aware that the purchase price was largely going to be funded through a loan from Rabobank. And they also knew, according to this so-called business plan that was circulated, that the vast majority of the cash sitting there in the corporation was going to be withdrawn immediately to repay the loan. Exactly. So do they have to know that the transferee will be insolvent so that taxes will never get paid? I don't know that they would have to know that, but, I mean, I think, you know, under the statute, it just requires a transfer that rendered — Well, your opposing counsel suggests that you failed to show that level of insolvency at the trial, and that was a fatal failure. Well, the court's entire UFTA analysis was premised on respecting the form of the transaction. Once you recharacterize the transaction as we suggest is necessary and proper, what you have, what you end up with, is a corporation with X amount of cash and then a large tax liability, and they are making a liquidating distribution to their — to the shareholders, leaving themselves without enough money to pay the tax liability. So the one thing that I was really confused about is that you, Commissioner, at trial stipulated that there was, in fact, a valid debt recovery business created in 2001. We did not stipulate that the company that was purchased, you know, the Sloan Broadcasting, which changed its name to Arizona Media, we did not stipulate that they engaged in an asset. Well, this is amazing to me because they — the other side says not only did you stipulate that, in fact, Arizona Media was engaged in a viable business of debt recovery, but that you also stipulated, at least according to them, that the total earnings over two years was $1.6 million. And then I see in your pleadings that the total income was all investment interest income of $4,000 and $5,000 a year. Right. And that's the tax returns that are telling us that. Okay. So what did you stipulate to — or what did the commissioner — you weren't counsel at that moment, but what did the — Right, right. My understanding as to — and this was during the trial. This was not part of the stipulation of facts that's entered into, you know, before the trial. This was at the trial during, you know, when counsel was examining an IRS agent, I believe. And I think we stipulated that, you know, Midcoast or whoever it was that the — I'm forgetting the name of the corporate — Sloan Broadcasting, Arizona Media Holdings, you know, they were going to engage Midcoast. They were basically going to passively invest their cash, their remaining cash, hand it over to Midcoast to engage in this asset recovery business. So I think we have stipulated that Midcoast certainly kept its business, its business of, you know, asset recovery, kept moving along with that. But we did not stipulate the monies in the account. There was some $7 million put in right at the time of the closing. You're suggesting that Arizona Media ran a debt recovery business, and I thought — I thought the commissioner stipulated, in fact, on page 410 of the transcript, it would essentially say that, but I would stipulate that there was debt recovery business going on shortly afterwards. That's Mr. Duncan. Right. Basically, what you're saying is that the business — there is, in fact, a viable business which is going on after this transaction. But not through this corporation that was purchased. It was always going to be and always was executed, this business executed by this separate entity, Midcoast. And so they may have continued that business, but — Well, what was the role that they played in the critical transaction between — Well, allegedly, you know, what — I think there was going to be — after the rest of the cash was siphoned out of the corporation, I think there was supposedly going to be like $2 million left. And that money — I'm sorry, out of which corporation? I'm sorry, out of the purchased corporation, Sloan Broadcasting and Arizona Media. I think there was going to be allegedly $2 million left for basically passive investment. You know, they would turn this money over to this third party, Midcoast, who would use that money in their business of asset recovery, you know, of bad receivables. You're saying that had nothing to do with the tax consequences of the sale of the stock to the other corporation? Well, yeah. I mean, basically, again, the idea was that whatever little amount of cash was left in that corporation was just going to be passively invested. The corporation, Sloan Broadcasting slash Arizona Media, was not going to be engaged in an asset recovery business. They weren't going to have any employees. They weren't going to have any office space. They just had cash that this other third party was going to use, allegedly, in its asset recovery business. So we did not stipulate that the purchased corporation engaged in an asset recovery business. So, anyway. So you stipulated that the place that they sent the $2 million that was left over was engaging in asset recovery? Sure. Midcoast, yeah. Midcoast was engaging in an asset recovery business. And, but again. But not that the transferee corporation? Correct. You look at their tax returns over the year, you know, over those two years, the first two years, it was like $5,000 of interest each year. And, you know, over six or whatever many, however many years before it got its license revoked, it never had any income. But this is just really confusing to me because they say, the other side suggests, that you entered into a stipulation during the course of the trial. And I've looked at this. During the course of the trial in which you say that Arizona media was engaged theoretically in this business and that their claim is that you also implicitly agreed that $1.6 million was raised in pursuit of this business. During the first two years. And what you're suggesting is that's totally a different company. It is. And that's, that was what our stipulation, I mean, we did not, we stipulated that, yes, an asset recovery business was going on. We didn't stipulate that it was Arizona media's business. You know, that, that's as good as I can, you know, that's, that's my understanding. But you read their pleadings consistently. Absolutely. So we're, we're talking night and day. Yes. I mean, you, you're not even on the same planet. Right. And I think, and I think we cited our reply brief in the remand proceedings where we said, no, we did not stipulate that the purchased corporation continue, you know, engaged in an asset recovery business. We, we stipulated that there was an asset recovery business carried on by someone else. Anyway, getting back to this knowledge of the scheme requirement, in, in the HPE leasing context, it makes sense to, in that situation, to condition the first party's potential liability in this regard on a showing that he knew or should have known of the debtor's intent to retransfer the property for no consideration. Because absent that retransfer of the property, that second leg of the transaction, there would be no legal basis for treating the exchange between the first party and the debtor as anything other than what it purported to be, a transfer for fair consideration. In contrast, as Judge Noonan recognized in his separate opinion in the first appeal of this case, a sale of the stock of a corporation holding nothing but cash has no substance in and of itself, regardless what the new owners may subsequently do with the corporation. So, in other words, the legal basis for recharacterizing such a stock sale in accordance with its substance as a liquidating distribution by the corporation to its historic shareholders is not dependent on the subsequent actions of the party with whom the shareholders transacted. Well, what, then, but he was the dissenting judge, so. Oh, he just dissented, yeah, right, right. He felt that the record was clear enough to where the — There was no substance, and it didn't have to be remanded on that issue? Correct. Correct. So — But the majority did. Yes. The majority remanded, and on remand, the Court, instead of looking at the Federal prong, looked at the State prong, so. So what would you have Sloan do when they're exploring the legality of this particular proposal? And they're confronted with a representation that everything is above board, we're not going to have to actually file anything which suggests that we are doing anything illegal, but we're not going to give you our proprietary information. You have to accept the fact that we are representing to you that you're not doing anything illegal, and that you've also got a lawyer and an accountant to say that it could very well be that they're not doing anything illegal. Is that enough to warrant any kind of suspicious activity, and is that enough to do to justify reliance on the representation? Well, I would say, you know, just the nature of the transaction. A sale of the stock of a corporation holding nothing but cash is suspicious in and of itself. The fact that the purported stock purchaser won't disclose how he's going to get rid of this tax liability is proprietary. That's another red flag. I mean, under the then existing definition of tax shelter in the Internal Revenue Code for tax shelter registration purposes, that provision specifically flagged transactions claimed by the promoter to be proprietary. So, again, it's the — it's what the advisors should have known that we're focused on, and there's no dispute that that constructive knowledge can be imputed to the taxpayers in this case. So we would say, yes, there's plenty of red flags that should have gone. But they did say that there was no tax avoidance issue that they were going to have to comply with by following — by filing disclosures, right? In other words, basically, the representation was, you can't — we're not going to tell you what we're going to do because it's proprietary, but we will say that we're doing nothing illegal, and we're not going to have to file those representations about tax avoidance plans. And what they represented was that the purchasing corporation had not — you know, had theretofore not engaged in any listed transactions. That entity had been in existence for just a few months. You know, I would think you would demand a representation that, you know, however you're going to — however you say you're going to get rid of this tax liability is not a listed transaction. And if I may, unless you have further questions. Yeah, let's stop the clock. We'll give you the full three minutes. I have two questions for you that — just to help my confusion. The first is, you obviously want us to reverse the tax court's ruling on the State law component of this. Yes. And let's say we did that. You then say, and furthermore, you all should just go on and do what Judge Noonan told you to do originally. And so let's say we did that. But then you say — and then remand the case for further proceedings. What do you need to be done? The only thing left would be the application of the Arizona UFTA to the transaction as recharacterized. Frankly, you know, I think this Court could also perform that exercise in the first instance. But I appreciate the fact that, you know, if you were to rule in our favor in this appeal, you might want to, you know, leave that exercise to the tax court. You guys don't want to come back here a third time. I certainly — I am certainly happy if you take care of this all in one fell swoop. Okay. So a second question is, did you happen to argue that case on Friday that's kind of related? I'm sorry? Did you happen to argue that case that was argued on Friday of last week that's involving — Oh, the Tricarci? Yes. I did not, no. Okay. Do you have any knowledge of what relationship the issues in play there might be to our — Well, I mean, it's the same basic transaction. That was my understanding. So that's why I was asking. Is there — they would have priority under — you know, in terms of any overlapping issues, but you're not aware of how exactly their issues line up with ours? Well, I mean, you know, it's different State law. But, again, you know, you're talking about the UFTA. So — and, I mean, again, the basic — you know, I know counsel will say, well, every case stands on its own facts. And, of course, there are — every case has unique facts. But, I mean, the basics are the same. A corporation sells all its operating assets and is holding nothing but cash. And then Midcoast or Fortran swoops in and says, hey, we'll pay you this huge premium for this empty shell of cash because, yeah, we know how to get rid of the tax. Okay. Great. Thank you. We'll hear from you again on rebuttal. Let's hear from counsel for the taxpayers. Thank you. I'm Steve Silver. May it please the Court. I am somewhat anxious to get up here and carry on what Judge Sessions said. Unfortunately, there's been a lot of misstatements in the record by the government. The bank records showing the amounts collected was in an account for Arizona Media, and it's in the record SER 104-210. So that's just for starters. What does that page of the SER purport to show? The record, the account in which the $1,600,000 was collected was an Arizona Media account. Counsel basically indicated that it wasn't an Arizona Media account. So what about the tax returns? Okay. Well, we're going to — okay. I'll address the tax returns. First of all, the tax returns that were filed by this company were false. The IRS determined they were false. This company was engaged in a massive fraud scheme. So rather than look at their tax returns, the government went to other evidence, and it's the other evidence that was developed and came out in this case that that was very helpful. I just want to make one mention of another point in the record that supports or indicates that Judge Sessions' record, SER 161, this is a document that clearly shows that Midcoast, the company that was the debt recovery business, a legitimate company, to the extent it held assets, it was holding those assets on behalf of Arizona Media. So just putting those aside — Well, what does that have to do with anything? I appreciate your attempt to clarify the record, but what does that have to do with anything that's before us now? It supports the record in the sense that this was a real transaction. And to go back to how you have to collapse it, what's required under Arizona law, we're here for just the State prong under the Uniform Fraudulent Transfer Act. And I underscore the word fraudulent. And in order to collapse and disregard Berlinetta, this company, you have to show by clear and convincing evidence knowledge of an illegitimate scheme. Well, constructive knowledge is enough. Well, fine. I'll take that, Judge. And that includes any knowledge you would have — your clients, the trusts and their clients, would have gained by doing a reasonably diligent inquiry, right? Absolutely. Actual or constructive fraud. Here, the government took the position there was actual fraud. The trial judge ruled against them. On appeal, the government conceded there wasn't actual fraud. So now they say, well, there's constructive fraud. So let's see what the parties looked at. And the one hot document in this case is Exhibit 26JER266. And what happened is, in most transactions, when this was presented to the CPA for the taxpayer, he says, well, I think we need a lawyer, a competent lawyer, to get involved. And so this fellow named Steve Phillips, very well-known lawyer, been a professor at the University of Arizona Law as a tax, he got involved and basically did the due diligence. And his memorandum, they can't get around it. You read his memorandum, which is in evidence, and he describes the transaction. He describes his discussions with the opposing or the other counsel. And they describe a transaction which, under the tax law, worked. The transaction, and I know — He did not opine one bit on the legitimacy of the underlying tax transaction in terms of whether the swap for the, whatever it was, these Treasury bills that were going to be — Oh, no, no. Right. Forget about the Treasury. The Treasury — Hang on. All — tell me if I'm wrong on this. All he was opining upon was that from the standpoint of our clients, we don't think there's going to be any transferee liability. And that's all I'm willing to say. That's how I read his memo. You have to get to how he got to that point. He got to that point in this memorandum based upon discussions with the counsel for the other party. And they told him the tax strategy, and there's nothing wrong with tax strategies, the tax strategy contemplated a Section 351 transfer. And what it means is when you have assets here and you want to transfer them to another company, that other company takes those assets and they get to use the basis that that asset has. So if that asset was valued at $10 for cost and it was only worth $5, the — the — the company gets a $10. Then what they said they were going to do is they had these assets that they were going to transfer in to this Arizona Media, which was the change in name to Sloan Broadcasting, and they could offset the — the losses from the gains. And quite frankly, that was — And then they said, well, can you give us the details on that so that we can figure out whether there's really a legitimate basis for doing that? And they said, no, those details are proprietary. And they said, oh, okay, well, great. We'll go home now. And I don't think — I don't think that is — is sufficient at all in terms of what your clients should have done. Again, I'm talking about the trust advisers here, right? Well, with all due respect, Your Honor, where I have a — I'm counseling. I'm meeting with other lawyers, talking to them, and they're telling me exactly what they're going to do. And then in terms of any more specificity, it's proprietary. But they tell me this is what they're going to do. This is the same testimony we had in the Alterman case. The same exact testimony, the same script was used. And Alterman was a case that was ruled in favor of the taxpayer. Much on many of the same facts we have here. So what I'm trying to do is show you that what we had is a glitch in the system. And I'm going to use a word people tell me not to use it, loophole. This was a loophole. And so what Congress did two or three years later, they passed Section 362. And Section 362, when you read the caption of it, it said, hey, we're going to now not allow you to take built-in losses and offset it against gains in the future. So what you had here is a tax strategy that was presented to a competent lawyer. He looked at it. He thought it worked. He counseled. No, he didn't. No, stop right there. Because where in this memo does he say that I think this tax strategy, as you're calling it, is going to work? It's in there, Your Honor. I can — I'm looking at the memo right here. Okay. Where in this does he provide an opinion on that? His focus was on we're not going to be subjected to transferee liability if that thing doesn't work. That's all he was opining upon. Well, Your Honor, the way I read it, Section 351 and 362 did work. And if these parties on the other transaction had been honest and had done what they said they were going to do, we wouldn't be here today. Okay. Sorry. Go ahead. Okay. I want to get back to the basis of the ---- To another provision which is really confusing to me, and that's, you know, there's a black-letter law which says that any particular provision which is designed directly to avoid taxes unto itself, that's it, is clearly illegal. Okay. Now, from your perspective, when Sloan looks at this arrangement, Sloan must know that the only way this would ever work is that Sloan's duly-owed taxes, $15 million, is going to be erased. And that is tax avoidance. Now, I don't know if there's a particular provision which would necessarily relate to that directly, but isn't that just almost a basic fact that they must have known that $15 million, which they legitimately owe out of the sale of their assets, was going to be avoided? Well, Your Honor, we have a group of cases that's all been digested in the briefs that tax strategies that are designed to eliminate or reduce taxes is okay. And so we start with that principle. The question is whether under the circumstances presented to Mr. Phillips, it was okay under the State prong. And so I submit to you that the undisputed facts, the trial testimony, supported the fact that this was believed to be a proper transaction. And to get to the rat killing, so to speak, in order to collapse a transaction under the Uniform Fraudulent Transfer Act, and I emphasize fraudulent, and disregard Berlinetta in this transaction, the government had the burden by clear and convincing evidence to show knowledge of an illegitimate scheme. That's it. Knowledge of an illegitimate scheme. And I submit to you, Your Honor, that the undisputed evidence and the memorandum that Phillips wrote back in 2001, I'm sure he didn't think you judges would be looking at it now, but he presented to this other lawyer, Greg Guderian, who had been a law clerk to Judge Holmes when she or Judge Hall when she was on the tax court, they believed that this is okay, this transaction is legitimate under the code to code sections. Look, I just he did not say because he did not know the details of what that transaction was going to consist of. I mean, do you have it in front of you? Yes, sir. I have the memo. Okay. Well, let's take ER-267. I think that paragraph 2 is the description he gave. I mean, first of all, he just goes through and describes what we've been told is going to happen, right? And I'm looking at paragraph 2, the second the buyer intends, right? That's what you're talking about. Yes, sir. So he describes it. He never says, and this is going to be upheld as legitimate. He doesn't have any basis to opine on that because they told him the details of the transaction are proprietary. So he just – I mean, that's why when you keep saying we had these reputable tax people look at this and they gave the green light on it, I don't think that's what he did. Well, the testimony at trial, Your Honor, the government called Mr. Phillips as an adverse witness, and his testimony supported the belief that the transaction, as he understood it, would be held up. And his memorandum, the contemporaneous – How could he opine on that when they told him the details are proprietary and we're not going to tell you? They told him the other details were proprietary. They apparently told him, per this memorandum, that this is what they were going to do, a 351 transaction, and they would offset the gain in the company by the losses created. Now, that's the – that's what they did tell him. There's no dispute. This memorandum is uncontradicted, and it was prepared back in 2001. Without any – Wouldn't you need, as a competent tax lawyer, before you were going to opine on whether that strategy would work, work in the sense that it would be upheld as legitimate by the IRS, wouldn't you need to know the details of exactly how that was going to work? What assets are you talking about? Where did they come from? Right? You would need to know all of that. Well, they – they told him – let's go back to who Mitkos was. Mitkos was a well-known debt recovery business. Mitkos, that name came up, and Mr. Phillips did a due diligence to see whether they were a real actor in the field. He was told Mitkos is going to – we're going to reengineer this company, just like an alderman, into a debt recovery business. We're then going to go out and get credit card debt, and we're going to – we're going to have some credit card debt that we'll – we're not going to be able to collect on it. We're going to write it off, and this will be a proper write-off against the gain. Mr. Phillips testified when asked – tell me if I'm remembering this right – when asked to, like, well, what did you understand about the nature of the business going forward that the Arizona Media Corporation would be – I thought he said I didn't understand. We did not know what this company was going to be doing, and that was part of the problem, right, is that they needed to have some basis for saying that the nature of the ongoing business was going to be legitimate, and then when they're asked about it, well, no, we didn't really understand it, and we didn't bother to try to find out more. Okay. Your Honor, there's a case we cite in our brief, Shell Petroleum, and it talks about Section 351. And knowledgeable lawyers – and I'm actually a tax lawyer – and it said, quote, as any knowledgeable tax layer would have known, and then it goes on and describes the Section 351 transaction. This stuff is rather routine. You know Section 351. You know how it works. You know Section – when Section 362 came along, you know, oops, Congress isn't going to allow this any longer. But our focus here is on the state prong, and I'd like to just get this out and make sure I have enough time. Again, knowledge of an illegitimate scheme. Now, there is no Arizona case under the Uniform Fraud and Transfer Act on this. That's correct. There are cases in other states that are focused on what the – that knowledge of the scheme is required. There is the outlier case, Wisconsin, and there's an Indiana case that don't require knowledge of the scheme. But they still require, guess what? You've got to prove one of three things, and the government didn't do it. You have to prove insolvency. So forget about it. Don't have knowledge of the scheme. You've got to prove insolvency. The government didn't prove insolvency. Well, insolvency is defined, though, as not enough money to pay the known liabilities. And there was no way this company was going to have $15 million to pay that tax liability. And everybody knew that. The only way this transaction could possibly have made sense is if, in fact, they could eliminate that liability. And everybody went in knowing that. Well, Judge, I think a trial is – from my perspective, that's the main event. We tried this case based upon what was going on. Government acknowledged in their reply brief here they didn't prove insolvency. So beyond anything else, they say they didn't prove insolvency. So let's look at the other two issues that they didn't prove and they were required to prove in order to get this under the Uniform Fraudulent Transfer Act. They have to prove a lack of assets. And in that regard, they didn't prove a lack of assets. Now, just as in district courts, we have in tax court a request for proposed findings of fact. And in this case, we had several proposed findings of facts. But I'm only going to read one of them because it just cuts to the chase, not our burden, their burden. And that is – and that is 295, and in essence, it said, Respondent, the government did not elicit testimony at trial regarding value of assets controlled by Berlinetta as of the closing of the Stock Purchase Agreement. And the government says irrelevant. Now, if they're going to deny that, deny it. But having assets is required. The Weintraub case, the government brought an expert in to show there was lack of assets. Here, they didn't put any – any testimony, and it was their burden to do so. The third element is inability to pay their debts as they become due. And here, there were debts that were obviously paid over a two-and-a-half-year period. As Judge Sessions noted, there was a stipulation. I had a government agent on the witness stand, and the government didn't want me to examine him. And he says, I'll stipulate to exactly what Mr. Silver said. And what Mr. Silver said is, in the record, there was a debt recovery business. It operated for two-and-a-half years, and it had $1.6 million in collectibles. And so what that does to the third element, which they never proved, is – is – is your inability to pay debts. This company at one point showed around $2 million of extra cash in their bank account, and they paid debts for the – Actually, in response to your request for a stipulation in the transcript, I don't recall the exact page, they responded by saying, yeah, we will stipulate that there's a debt recovery business. We may differ as to the amount. In other words, they never suggested that $1.6 million was stipulated as a part of the business for two years or two-and-a-half years. So that was left open. But they did, in fact, stipulate that there was a debt recovery business going on. But they didn't, as they say now, they didn't say who the business was. Is it Midcoast or is it Arizona Media or whomever? Well, Your Honor, you're a trial judge, and based upon the way that thing came down, I thought my statements were broad and inclusive, and the government was stipulating to it, and there was no need for me to further examine the revenue agent with respect to these points. But moving on to — Could I ask you — Yes, sir. Again, you're right, and I'm a trial judge. I'm sorry. No, no, I'm sorry. I know the facts, you know, sometimes become relevant. And I'm wondering, on the part of your clients, the Sloans, they are — offered this particular proposal. All of a sudden, they're going to get $9 million more than they would have gotten. To what extent do they have an obligation to really pursue in depth what's really going on here? Because the most logical reaction that anybody would have is, gee, the government's going to get ripped off of $15 million. What obligation do they have, before they agree to benefit from this particular proposal, to really explore what is going on? Okay. I think the record shows sufficient due diligence in this case based upon the testimony. There is another case. There have been many cases citing Sloan since this case. Some have taken some of the findings of fact from Sloan and say, aha, they had that there. We don't have that here. We rule against you. Others have said, hey, Sloan did this. This was good. This showed the due diligence. And I'm suggesting to you that what Phillips did is adequate due diligence. He did his due diligence. He checked who these people were. Fortran did not have a bad reputation. They had reputable accountants and lawyers. And all of this was trial testimony that went into the record that the government did not dispute. We had that trial. So I want to bring up a couple of other things. And it wasn't — and we fortunately found it. You make a request for FOIA on these cases. And we came upon some records in the government's file, the Revenue Agent's report. She had $7 million of a deposit to Berlinetta's bank account. It didn't come from us. She had a letter with a footnote on it that indicated the lawyer that did it, the used for the purchase. Now, there was a reservation of a hearsay objection in the stipulation. But we jointly stipulated to the exhibits. And the judge received the exhibits in evidence. And the Revenue Agent was testifying, Your Honors. And there was no hearsay objection made to the testimony as it related to this letter. Were you aware of the fact that there was a statement made of $18 million that was paid by — with Berlinetta's own funds? Yes. Did you do anything to follow up? No. Nobody objected to hearsay. Nobody objected to hearsay on the $7 million that she found in the bank account. So — and we know that Berlinetta had sources of funds available to it elsewhere. We'd never had a financial statement ever submitted of Berlinetta. Wouldn't you think the government would have done that in a normal transferee liability case dealing with the Uniform Fraudulent Transfer Act as they did in Weintraub? Weintraub, government, boy, they fine-tuned it. They showed there was no other assets. They didn't do it here. So in going through the — the State issue, only the State issue, because the Federal issue has never been ultimately decided by the trial court, as we know, the — the looked at it under Arizona State law. And he found under Arizona State law — and he applied the majority rule. Granted, there's no Arizona case. That they never showed — the government never showed knowledge of the illegitimate scheme, knowledge of the illegitimate scheme. And so — and then all those other elements, those other three under the — the ARS provision, the Arizona Revised Statute, government never put any evidence on that. And then to finally just kind of collapse this, because I'm going to be out of time. You're over your time. I'm over my — oh, I'm sorry. If you want to sum up, that's fine. Oh, okay. Thank you, Your Honor. I appreciate it. The problem that we've had in this case from the beginning, the government's had two bites at the apple. This case was remanded. Government did not want to open the record. They said, okay, we'll go with the record. They didn't want to. If they wanted to reopen any of the record, I assume the trial judge would have done that. So they stayed with the record. We're at a third point. And now they say there has to be a remand. You should remand it. And I'm saying a remand for what? The government has the burden of proof by clear and convincing. They've had two bites at the apple. They have not apparently, even to hear them say, not met their burden. Yet they want — Thank you, counsel. Thank you. We have a little bit of time for you to — for rebuttal. First of all, counsel keeps referring to, you know, that we didn't prove the insolvency of Berlinetta. Berlinetta was the purchaser of the stock of the debtor corporation. The solvency or insolvency of Berlinetta is irrelevant, as we indicated below in response to the request for findings of fact. It's the solvency of Sloan Broadcasting Company that is at issue here. So all of this stuff about, you know, a $7 million deposit here and this $18 million figure that came out of thin air from a tax opinion, it's all beside the point. We don't care about Berlinetta's financial — Well, I thought the government originally went after Berlinetta to pay the tax liability. Well, Berlinetta merged into — became Arizona Media. And so, yes, the government went after Arizona Media to collect the tax, yes. But again, what we're looking at, the point in time we're looking at is, you know, at the time of this stock sale, the debtor is Sloan Broadcasting Company. And were they insolvent? Were they rendered insolvent by this transaction? And again, if you look to the substance of the transaction, what we have here is a distribution of all but $6 million of cash out of this company, a gratuitous transfer, at a time when that company was facing a $15 million tax liability. That's obviously rendered them insolvent. And, you know, if you recharacterize the transaction as we say you should, that's the answer you get to. Regarding this change in the law in 2004, that is a red herring as well. It's basically a technical basis rule. Section 362 says nothing about the ability to offset an existing gain with a built-in loss from an asset that you contribute to the company. It talks about what your basis is. It says nothing about offsetting gains and losses. So that's a red herring. So can I just go back to the insolvency question, because I thought really the — I thought the significant issue is whether Sloan would have known that Arizona Media would be insolvent or not. If — because if Sloan knows that they're going to be insolvent, then Sloan knows that the IRS is not going to get any money as a result of their own tax obligation. So doesn't it really become important for Sloan to prove that the Arizona Media is not going to be insolvent, therefore no fraudulent scheme? I would agree that that would be helpful if they could show that. But I mean, I don't think that in order for us to prevail, I don't think under the UFTA you have to show that the transferee knew that this was making the transferor insolvent. Well, that's interesting, because their perspective — this is like night and day. Their perspective is that that is an obligation under the Arizona statute, the Arizona Fraudulent Transfer Statute. Oh, oh, no. What they're saying is that in order to recharacterize the transaction in accordance with its substance, the Sloans or their advisers knew or should have known of this — the entire scheme, that this was just a tax scam. The Arizona UFTA says nothing about that. And like we said, there's no cases on point either. But again, we suggest that, you know, Arizona courts apply principles of substance over form in various situations, and they would do so here as well. And again, you don't have the justification for the knowledge of the scheme requirement that you have in that HBE leasing context, because here, you know, the stock sale had no substance in and of itself without regard to what the stock purchaser later did with the company. Thank you, counsel. The case to argue will be submitted. We are in recess for the day.
judges: Schroeder, Watford, Sessions